UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AHMED AL-MENHALI, *et al.*, | ) | Case No.: 1:17 CV 1089 |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| MARRIOTT INTERNATIONAL INC., *et al.*, | ) | |
| | ) | |
| Defendants | ) | <u>ORDER</u> |

## I.  INTRODUCTION

Currently pending in the above-captioned case is: (1) Defendants Alexis Silva ("Silva") and Laura Acton-Bell's ("Acton-Bell") (collectively, "Employee Defendants")  Motion for Summary Judgment (ECF No. 41) on Counts 6, 7, 8, 9, 10, 11, 12, 14, and 16 of Plaintiffs Ahmed Al-Menhali ("Al-Menhali") and Taghrid Milki's (collectively, "Plaintiffs") claims against them; (2) Defendants Marriott International, Inc.[1] ("Marriott"), Inn on the River's Edge, L.P. ("River's Edge"), and Fairfield Inn & Suites Avon's ("Fairfield Inn") (collectively, "Hotel Defendants") Motions for Summary Judgment (ECF Nos. 42, 43) on Counts 10, 11, 12, 13, 14, 15, and 16 of Plaintiffs' claims against them; and (3) Employee and Hotel Defendants' Motions to Strike Plaintiffs' Exhibits (ECF Nos. 53, 58). Also pending before the court is Plaintiffs' Motion to File a Consolidated Opposition to Defendants' Motions to Strike Exhibits *Instanter* (ECF No. 63).

---

[1]    In their Response (ECF No. 50, PageID # 831, n. 1), Plaintiffs have indicated that they wish to voluntarily dismiss Defendant Marriott Hotel Services, Inc. The court will grant the dismissal.

For the following reasons: (1) Employee and Hotel Defendants' Motions to Strike Exhibits are **denied**; (2) Employee Defendants' Motion for Summary Judgment is **denied** as to Count 6, Count 9, and Count 16—and **denied**, in part, as to Count 12; (3) Hotel Defendants' Motions for Summary Judgment are **denied** as to Count 15  and Count 16 —and **denied**, in part, as to Count 12 and Count 14.  The court **grants** summary judgment in favor of Defendants on Counts 7, 8, 10, 11, and 13.  The court also **grants** Plaintiffs' Motion to File a Consolidated Opposition to Defendants' Motions to Strike Exhibits *Instanter* (ECF No. 63).

## II.  BACKGROUND

On May 24, 2017, Plaintiffs filed this civil action against the Employee and Hotel Defendants,[2] alleging state law claims related to an incident which occurred at Fairfield Inn in Avon, Ohio, on June 29, 2016, resulting in Al-Menhali's seizure by police officers of the City of Avon ("Avon PD"). Plaintiffs allege claims for Unlawful Discrimination in Violation of Ohio Revised Code § 4412 (Count 6); Making False Alarm (Count 7); Intentional Infliction of Emotional Distress (Count 8);  Negligent Infliction of Emotional Distress (Count 9); False Light Invasion of Privacy (Count 10); Defamation and/or Libel (Count 11); Negligence and/or Gross Negligence (Count 12); Negligent Hiring (Count 13); Negligent Training/Supervision (Count 14); and *Respondeat Superior* (Count 15). (*See* Compl., ECF No. 1.) In addition, Plaintiff Al-Menhali's wife alleged a claim for Loss of Consortium (Count 16). (*Id.*)

---

[2] Plaintiffs also filed federal and state law claims against officers of the City of Avon Police Department. On February 20, 2018, the Avon Defendants filed their Motion for Summary Judgment (Mot. Summ. J., ECF No. 34), which was granted by the court. (*See* Order, ECF No. 65.)

Plaintiffs are husband and wife, and citizens of the United Arab Emirates ("UAE"). (*See* Al-Menhali Dep. at 14:14–15:5.) During the spring of 2016, Plaintiffs were legally and temporarily residing in the Cleveland area while Al-Menhali sought medical treatment at the Cleveland Clinic. (*See id.* at 163:16–164:1.) On June 29, 2016, Al-Menhali arrived at the Fairfield Inn, seeking extended stay accommodations during the time when the Republican National Convention ("RNC") was held in Cleveland. (*See id.* at 142:13–144:4, 145:23–146:5.) At the time, Al-Menhali was wearing traditional UAE national dress, consisting of a *kandura* (a robe), a head scarf, and a head covering. (*See id.* at 148:15–:16; *see also* ECF No. 40.) He was also wearing prescription sunglasses, and carrying two cell phones so that he could communicate both locally and internationally. (*See* Al-Menhali Dep. at 148:15–:17, 149:1–:5, 11–:19.)

While at the Fairfield Inn, Al-Menhali spoke with Silva, a hotel receptionist, and inquired about extended stay options at the hotel. (*See* Al-Menhali Dep. at 146:1–:5, 149:20–150:9.) According to the Employee Defendants, "[Silva] was still in the midst of training for her new position at the time of the subject incident." (ECF No. 41, PageID # 634; *see also* Acton-Bell Dep. ECF No. 36, PageID # 283.) Unsure as to whether the hotel offered extended stays, Silva "popped" into her manager's office to inquire whether the hotel offered extended stays. (Acton-Bell Dep., ECF No. 36, PageID # 288.) Acton-Bell, the on-duty manager, informed Silva that they did not offer extended stays; however, they did offer a reduced rate if a guest stayed four or more consecutive days. (*Id.*) Silva relayed the information to Al-Menhali. (*Id.* at PageID # 289–91.) Soon after, Silva returned to her manager's office a second time to inquire how to search for hotels in the area that might accommodate Al-Menhali. (*Id.*)

According to Acton-Bell, when Silva came back to her office this second time, "her voice was cutting out" and she seemed nervous. (*Id.*) Acton-Bell went with Silva to assist Al-Menhali. (*Id.*) Employee Defendants maintain that they printed off internet search results of hotels in the area that they believed offered extended stays. (*Id.*)  Although she was then aware that Silva was nervous and uncomfortable, Acton-Bell returned to her office, leaving Silva alone to attend to Al-Menhali. (*Id.*)

In a statement given to the Avon PD, Silva explained that at some time while she and Acton-Bell were assisting Al-Menhali, Acton-Bell walked up to her and "slipped a paper in front of [her] that" continuously and repeatedly had the following message typed down the entire page: "get the gentleman out/away from the Fairfield Inn." (Avon PD Narrative, ECF No. 45-1, PageID # 760.) According to Silva, because Plaintiff was still standing at the front desk during this exchange, she "folded the paper and set it next to the keyboard. . .because she didn't want him to see the paper [Acton-Bell] gave [to her]." (*Id.*) Acton-Bell testified that she typed the memo, instructing Silva to "get [Al-Menhali] as far away from [FairField Inn] as possible," sometime between printing the hotel search documents and "walking back and forth to monitor the situation." (Acton-Bell Dep., ECF No. 36, PageID #326–29.) She maintains that she did so because Al-Menhali was lingering too long after she gave him the information regarding other hotels. (*Id.*) Al-Menhali testified that he stepped away from the desk and made at least one phone call to another hotel. (Al-Menhali Dep., ECF No. 37, PageID # 503.)

Shortly after the note exchange, and as Al-Menahli was stepping away from the front desk, Silva said that she "heard [Al-Menhali] on the phone repeating Ali [sic] or alla [sic] 3 times and was talking in a different language." (ECF No. 45-1, PageID # 761.)  Silva explained that she then returned to Acton-Bell's office and told her what happened. (*Id.*) According to Acton-Bell, Silva

4

asked her to help Al-Menhali "because [he was] really making [her, Silva,] nervous" and uncomfortable. (ECF No. 36, PageID # 292.)  Acton-Bell testified that she "grabbed [Silva] by the shoulders and told her to calm down" and that she knew "how to handle situations of [such] nature." (*Id.*) She then told Silva that she could stay in the office and shut the door. (*Id.*) She informed Silva that "[i]t's an oak door, and heavy, and it automatically locks." (*Id.*) As Acton-Bell was walking away to attend to Al-Menhali, Silva told her that she was going to text message her sister. (*Id.*)

Unbeknownst to Al-Menhali, at 5:53 p.m., Sergeant George Ruple ("Sgt. Ruple"), a dispatcher with the Avon PD, received a 911 call from Silva's sister, Allison.  (*See* Initial 911 Call, Ex. A, ECF No. 35.) Allison informed Sgt. Ruple that her sister had told her, through text messages, that a man was in the hotel lobby, "in a full headdress with multiple disposable phones pledging…his allegiance or something to ISIS,[3] and is very panicky," and "suspicious." (*Id.*)  Shortly thereafter, Avon PD received another 911 call from Silva's father, also indicating that he was calling for help on Silva's behalf, who was "terrified," and hiding "in the back." (*See* Second 911 Call, Ex. B, ECF No. 35.) A record of the text messages between Silva's sister (Allison), father (Lonnie), and mother (Nicole) were obtained by the Avon PD. (ECF No. 39–1, PageID # 214–16.) The text conversation, with spelling and grammar taken verbatim from Silva's phone, dictated as follows:

> [Silva]: Love you guys.
> Nicole ([Silva's Mom]): You do
> [Silva]: There's a guy at my work who is pledging to ISIS. He's in the
>         full outfit.
> [Silva]: My manager is freaking out.
> Nicole: Call 911 now!
> Ally ([sister of Silva]): Call it or I am
> Nicole: how
> Nicole: Do you want me too?! [sic]
> Nicole: Call 911!

---

[3]     The Islamic State of Iraq and Syria ("ISIS") is a known terrorist organization.

Nicole: Hello [Silva] What's going on??

Ally: I'm calling

[Silva] 5:55PM: Mom call and tell them a suspicious guy here at the
      desk with deaposible phones two of them and dress in the full
      outfit.

[Silva] 5:55PM: Please someone

Lonnie ([Silva's Dad]): Call now

[Silva]: Just say it's suspicious

Ally: I am RIGHT now

[Silva]: Someone please it's Avon

[Silva]: Help me

[Silva]: Please

[Silva]: It's FairField Inn in Avon on Colorado

[Silva]: Please help

[Silva]: My phones dying

[Silva]: I'm in the back

[Silva]: he won't leave

[Silva]: He's sitting in the lobby

Lonnie: They are on there way

[Silva]: Did you say suspicious man in full gear with two phones

Ally: Yes

Lonnie: Yes

[Silva]: Looking for somewhere to stay for a month

[Silva]: They can't have sirens on

Lonnie: They said they just spoke with Allison

[Silva]: I can't have them coming here with sirens

Nicole: Did you tell them that ally???

Ally: No she didn't say no sirens

[Silva]: Shooting

Ally: What

Ally: Shooting?

[Silva]: Help

[Silva]: Shooting

[Silva]: Help

Lonnie: No

Ally: Lex

Ally: Dad go up to her work

Lonnie: Serious

Nicole: I'm on my way!

Ally: Lexi call me

Nicole: Lonnie I have tried and Alli has tried she's not answering

[Silva]: I'm ok stop

Lonnie: Are they shooting

6

Ally: What's going on
END OF CONVERSATION.

(*Id.*; *see also* ECF No. 41, PageID # 637–38.) (typos in original) (emphasis in original).

Subsequently, over the radio, Sgt. Ruple requested that available Avon police units head to "Fairfield," and informed them that he had received "a third-party call from the sister of the desk clerk and also her father," and that the callers had reported an "Arabic male, in full headdress, several cell phones, claiming his allegiance to ISIS." (*See* Radio Traffic at 0:01–:25, ECF No. 35.)

While responding officers were in route to the Fairfield Inn, Sgt. Ruple attempted to call the hotel's front desk and was briefly placed on hold before being connected with Acton-Bell. (*See* Call from Dispatch to Hotel at 0:03–1:45, ECF No. 34.) When Acton-Bell initially answered the call and Sgt. Ruple identified himself as being with the Avon PD, she did not indicate that there was any problem, nor did she demonstrate any signs of being in distress. (*See id.* at 1:35–2:12; *see also* Avon PD Narrative, Ex. D, ECF No. 34-9.) Sgt. Ruple explained to her that he received a call from Silva's family, claiming "that there was an Arabic male in [the hotel] threatening everybody [sic]. . . and claiming his allegiance to ISIS." (*See* Call From Dispatch to Hotel at 1:35–2:12.)  Acton-Bell hesitated and then answered saying, "[Al-Menhali] is exiting, he just waved, and yes, he has two cell phones. He has a disposable. . ." (*See id.*) Acton-Bell suddenly became excited, however she informed Sgt. Ruple that she did not believe Al-Menhali was armed. (*See id.* at 2:08–:22; *see also* Avon PD Narrative Supp.) Acton-Bell's excitement coincided with fully armed officers converging on Al-Menhali's position as he exited the lobby and shouting orders for him to get on the ground. (*See id.*) At that point, Acton-Bell informed dispatch that her co-worker, Silva, was "freaking out"

7

and "having trouble breathing." (*See* Call from Dispatch to Hotel at 3:25–4:22.) Sgt. Ruple ended the call once he heard officers entering the lobby. (*See id.* at 4:30–:39.)

Prior to his detention and still unaware of the 911 calls, Al-Menhali maintains that he grew tired of waiting on Employee Defendants to provide him with the requested information, so he decided to leave. (Al-Menhali Dep., ECF No. 37, PageID # 505–06.) Acton-Bell testified that the entire transaction with Al-Menhali, from the time he entered the hotel until he decided to exit, lasted about 20 minutes. (Acton-Bell Dep., ECF No. 36, PageID # 300; *see also* Al-Menhali Dep., ECF 37, PageID # 510.) Al-Menhali emerged from the front doors of the lobby with one of his cell phones in his hand. (*See* Smith Body Cam at 1:31; Al-Menhali Dep. at 155:25–156:7, 159:5–:15.) At that moment, Lt. Fischbach and Officers Barton, Sidor, and Smith, who had been gearing up in the parking lot, spotted Al-Menhali, immediately drew their weapons, and quickly converged on Al-Menhali's position just outside of the lobby doors. (*See* Barton Body Cam 0:00–1:05; Smith Body Cam 1:30–2:15; *see also* Avon PD Narrative Supp., Ex. L, ECF No. 34-11.) As they quickly approached Al-Menhali, the officers shouted multiple orders, including: "on the ground now, do it now," "drop that," "step away," "show your hands," "prone out," and "hands straight out in front of you, don't move." (*See id.*)

Although initially hesitating, within seconds, Al-Menhali complied with the officers' orders and sank to his knees. (Al-Menhali Dep. at 159:11–:25, 160:1–:5; *see also* Avon PD Narrative Supp.) Al-Menhali never displayed any signs of aggression towards the officers at any point prior to or during the seizure, nor made any attempt to resist or evade apprehension. (*See id.*) None of the officers discharged their weapons. (*See id.*)

8

Officers Sidor and Smith secured Al-Menhali; Officer Sidor placed his knee on Al-Menhali's back, while Officer Smith assisted him with handcuffing Al-Menhali's hands behind his back. (*See* Smith Body Cam 1:30–3:30; *see also* Al-Menhali Dep. at 160:23–161:7.) At the time of the seizure, Al-Menhali did not indicate that he was in any pain from the officers' actions, but he did ask, "What is this?...What happened?...I'm a tourist and this is not good." (*See* Smith Body Cam 2:12–3:00; *but see* Al-Menhali Dep. at 161:5–:7, 162:5–:6, 164:10–:15 (describing pain in chest at time of arrest due to prior heart operation).) After handcuffing Al-Menhali, Officers Sidor and Smith stood him to his feet and seized all his personal effects from his person, including a wallet, his shoes, and two cell phones, one of which Officer Smith had thrown into the bushes during the arrest and had begun to ring. (*See* Smith Body Cam 2:45–7:08, 10:25–:46.)

Officer Barton and Lt. Fischbach had entered the lobby to gather information from the hotel staff and the reporting parties. (*See* Avon PD Supp.) Silva explained that she had texted members of her family because Al-Menhali had two phones, kept asking questions about accommodations, was talking on the phone in a language she did not understand while waiting in the lobby, was wearing "a weird outfit," and because of "everything that's going on with ISIS." (*See* Fischbach Body Cam, ECF Nos. 34-3, 35.) Upon hearing this version of events, Lt. Fischbach immediately informed the other officers to "stand down" and release Al-Menhali. (*See id.*)

Within a few minutes of his seizure, Al-Menhali was removed from the patrol car and released from his handcuffs. (*See* Smith Body Cam 7:40–:50, 9:05–:23; Fischbach Body Cam 3:15–4:05; *see also* Avon PD Narrative Supp.) At that point, Al-Menhali, who speaks Arabic and little English, attempted to have officers get into contact with a friend of his, Ahmed Quassay Ali, who he indicated was a Cleveland police officer. (*See* Smith Body Cam 11:00–13:11; Fischbach

9

Body Cam 3:40–:54, 5:30–7:20; *see also* Al-Menhali Dep. at 169:19–170:24, 198:23–199:4; Field Case Report 1.) Lt. Fischbach also contacted an Arabic translator, in hopes of having them explain to Al-Menhali why the police had been called, and why he had been apprehended. (*See* Lt. Fischbach Body Cam 4:08–:30; 6:10–8:05.) Before any message could be relayed, Al-Menhali fainted. (*See* Smith Body Cam 13:05–16:32; *see also* Al-Menhali Dep. at 165:15–:17.) Shortly thereafter, members of the Avon Fire Department transported Al-Menhali to St. John's Medical Center for evaluation and treatment. (*See* Smith Body Cam 15:30–16:32; *see also* Avon PD Supp.)

The detention lasted approximately twenty minutes from the time the police arrived and seized Al-Menhali to the time he fainted. (*See, e.g.*, Smith Body Cam; Fischbach Body Cam; Sidor Cruiser Cam; *but see* Al-Menhali Dep. at 165:7–:17 (indicating the event lasted about an hour).) Al-Menhali's memory of the events which took place after he fainted were affected by his prior medical condition. (*See, e.g.*, Al-Menhali Dep. at 166:4–167:20, 198:23–199:4.) Following the incident at the Fairfield Inn, Al-Menhali was in the hospital for approximately three days. (*See* Hosp. Discharge Summ. 1, Ex. A, ECF No. 40-1; *but see* Al-Menhali Dep. at 167:1–:20 (recalling being in the hospital for five days).) In addition to complications related to his prior heart conditions, Al-Menhali suffered an injury on his right arm and bruising on each of his wrists. (*See* Al-Menhali Dep. at 167:21–169:18, 196:24–197:22.) Al-Menhali experienced symptoms of, *inter alia*, confusion, dizziness, weakness on his left side, aphasia, major depressive disorder, and acute stress reaction. (*See* Hosp. Discharge Summ. 1.)

As a result of the incident, Al-Menhali was referred to, and received, psychological treatment in both Ohio and the UAE. (*See* Al-Menhali Dep. at 186:13–189:2, 190:21–192:24, 193:21–194:10.) After receiving additional medical treatment for his prior health conditions, Al-Menhali prematurely

ended his stay in the United States, and returned to the UAE approximately three weeks after the incident. (*See* Al-Menhali Dep. at 185:15–190:20.) At the time of his deposition in this case on December 11, 2017, Al-Menhali was continuing to experience psychological effects related to the incident, including nightmares and hallucinations, and was continuing to seek psychological treatment in the UAE. (*See* Al-Menhali Dep. at 191:5–192:24, 193:21–194:10; *see also* ECF No. 47, PageID # 782.)

Furthermore, according to Al-Menhali, the subject incident received national and international news coverage. (*See* ECF No. 47, PageID # 782.) Al-Menhali alleges that the "false terrorism allegation and the resulting violent seizure," seriously harmed his reputation, related ability to do business, and his business profitability. (*Id*. at PageID # 782–83.) Al-Menhali maintains that "many potential investors and partners refuse to work with [him] because they do not want to tarnish their own reputations by association with him." (*Id*.) Al-Menhali also claims that the change in his business relationships is directly related to the incident at FairField Inn and the international media coverage that followed. (*Id*.)

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and provides:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A party asserting there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

11

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party has the burden of production to make a *prima facie* showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*.

If the moving party meets its burden of production, then the non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Zinn v. United States*, 885 F.Supp.2d 866, 871 (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)). The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Id*. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

## IV.  LAW AND ANALYSIS

### A.  Motion to Strike Exhibits

As an initial matter, Employee Defendants and Hotel Defendants each have filed Motions to Strike Exhibits A, B, C, D, E, and F, that were attached to Plaintiffs' motions opposing summary judgment. (ECF Nos. 53, 58.) Employee and Hotel Defendants contend that these exhibits, which include recorded statements to police, business correspondences, and a letter from one of Al-Menhali's treating physicians, are not properly submitted because they are not authenticated, are hearsay, or fail to properly state expert opinions. (*See* ECF No. 58, PageID # 900.)

Defendants argue that Exhibits A and B cannot be considered because Plaintiffs have not authenticated the recordings. These exhibits are video recordings of statements given by Employee Defendants to Avon PD during the course of their investigation. (ECF No. 62, PageID # 929.)  The recordings were produced during discovery by Avon PD Defendants; however, Employee and Hotel Defendants referenced and relied on statements in the recordings throughout this litigation. Further,

13

Plaintiffs argue that the "recording constitutes statements of a party-opponent and are admissible pursuant to Fed. R. Evid. 801(d)(2)(A)." (*Id*.)

The court finds Defendants' arguments unavailing. In short, the portions of the conversations that Plaintiffs reference in their opposition to summary judgment are statements by a party-opponent (Employee Defendants), which fits squarely within Rule 801(d)(2)(A)'s definition of statements that are not hearsay. *See* Fed. R. Evid. 801(d)(2)(A). Further, Plaintiffs have explained that they will call the police officers that made the recordings to testify to their authenticity at trial, if Employee Defendants choose not to testify.

Next, Employee and Hotel Defendants maintain that Exhibits D, E, and F, letters from Al-Menhali's physician and business associates, must be stricken because they are inadmissible hearsay, not authenticated, and are not proper evidence of expert opinion. (ECF No. 58, PageID # 901; ECF No. 64, PageID # 940.) Hearsay is classically defined as an out-of-court statement offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Therefore, critical to this analysis is the reason the letters are being offered into evidence. If they are not being offered to prove the truth of the matter asserted, then they are not hearsay. Also, they can fall under a number of exceptions to the hearsay rule.

In respect to Exhibit C, the court finds that these media articles are not necessary to a decision of any issue in regard to the motion. In respect to Exhibit D, the letter from Plaintiff's treating physician, Plaintiff has clearly indicated that the doctor would be available to testify at trial regarding the matter covered in his letter, and he does not seek to use the doctor as an expert. In regard to Exhibits E and F, Plaintiff indicates that the parties were working on scheduling the depositions for the authors of the letters regarding his economic losses, and they would be available

14

to testify at trial.  Further, he indicated that he would have the content of the letters submitted in affidavit form if given permission by the court.  It is also clear that Plaintiff has not sought to qualify the authors of the letters as experts.  With the caveats mentioned, the court denies Defendants' Motions to Strike Exhibits (ECF Nos. 53, 58), finding that Plaintiffs have shown that the materials  they wish to utilize can be presented in an admissible form at trial.  Fed. R. Civ. P. 56(c)(2).

### B.  Discrimination Claim

Count 6 of Plaintiffs' Complaint, claims that Employee Defendants discriminated against Al-Menhali because of his race, color, religion, and national origin, in violation of Ohio Revised Code § 4112.02(G) (ECF No. 1, PageID # 18.) Ohio Revised Code § 4112.02(G) provides that it shall be an unlawful discriminatory practice:

> For any proprietor or any employee, keeper, or manager of a place of public accommodation to deny to any person, except for reasons applicable alike to all persons regardless of race, color, religion, sex, military status, national origin, disability, age, or ancestry, the full enjoyment of the accommodations, advantages, facilities, or privileges of the place of public accommodation.

The statute was created "to eradicate illegal discrimination in places of public accommodation so that full enjoyment is available to all." *Meyers v. Hot Bagels Factory, Inc.,* 721 N.E.2d 1068, 1082 (Ohio Ct. App. 1 Dist. 1999).

Ohio courts have explained that the "full enjoyment" of places of accommodation, such as hotels, means "the right to purchase all services or products of a place of public accommodation, the right to be admitted to any place of public accommodation, and the right to have access to the services and products of such a place in the same manner as all other customers." *Id.* at 1083. The Ohio Supreme Court has held that "[w]hen determining whether there has been unlawful discrimination

15

under R.C. 4112.02(G), the test is simply whether the. . . manager[] or employee of a place of public accommodation has denied to any person the full enjoyment of such place *for reasons not applicable alike to all persons*, irrespective of race, color, religion, national origin or ancestry. *Ohio Civil Rights Comm'n v. Lysyj*, 313 N.E.2d 3, 6 (Ohio 1974) (emphasis added).

It is undisputed that Fairfield Inn is a place of public accommodation. However, there is a genuine issue of material fact as to whether Al-Menhali was denied the "full enjoyment" of *all of the services* at the hotel. Defendants maintain that because they did not offer extended stays to any guests, they were not in violation of O.R.C. § 4112.02(G). Plaintiff Al-Menhali argues that "full access" of the services of the hotel extended beyond Al-Menhali's room requests; but,  included voluntary, peaceful, and safe egress within a reasonable time frame.

As explained above, Ohio courts have defined what "full enjoyment" means, but proprietors are left with the freedom to decide the services they will and will not offer to their customers. Defendants rely on *Fall v. LA Fitness*, wherein a district court, analyzing O. R. C. § 4112.02(G), found that the plaintiff, a Muslim gym patron, was not denied the full enjoyment of the fitness facility. 161 F. Supp. 3d 601, 610 (S.D. Ohio 2016). In *Fall*, a gym employee informed the plaintiff that he was not allowed to pray in a particular East-facing corner of the men's locker room. *Id.* at 603. The plaintiff sued the gym claiming religious discrimination. *Id*. The district court specifically found that "[e]ven if 'full enjoyment' included prayer, . . . there [was] no support for [the plaintiff's] contention that other members were permitted to pray in the corner location of the men's locker room[]" where the plaintiff wanted to pray. Therefore, the district court held that the gym had not violated Section 4112.02(G). *Id.*

16

The present case is distinguishable. First, although Employee Defendants assisted Al-Menhali with the initial transaction, there is nothing in the record suggesting that it is the hotel's policy to require *all* potential guests to immediately leave the premises, once a hotel employee has informed them that it cannot accommodate the requests. *All* of the services might include the enjoyment of sitting in the hotel's lobby for a reasonable period of time to make other arrangements before exiting. The record evidence shows that other individuals were enjoying access to the hotel's lobby and making phone calls throughout Employee Defendants and Al-Menhali's interaction,[2] and no evidence was put forward demonstrating that all the guests in the lobby at that time were registered guests.

Further, the Employee Defendants testified that their discomfort during the transaction was due, in part, to the fact that Al-Menhali did not immediately leave after they gave him the printed sheets with other hotels. But, the triggering events leading to Al-Menhali's temporary detention by Avon PD were put in motion well before he finished making his inquiry and before he had the opportunity to peacefully sit in the lobby of the hotel, make his phone call, and exit voluntarily. The evidence shows that while Acton-Bell was assisting Al-Menhali, she discreetly passed Silva a note with the repeated message, "get [Al-Menhali] as far away from Avon as possible," filling up the entire sheet of paper. Acton-Bell testified that, sometime after she slipped the note, Silva came to her office and requested that she take over assisting Al-Menhali because she was nervous. As Acton-Bell was leaving the office to return to Al-Menhali, Silva told Acton-Bell that she was going text her family. Silva wasted no time sending the text messages. Silva told Avon PD that she sent the text massages to her family because Al-Menhali was talking on the phone in a language that she did not understand,

_____

[2]     Acton-Bell testified that there were "a lot of people in the lobby on their phones," in addition to Al-Menhali. (Acton-Bell Dep., ECF No. 36, PageID # 295.)

17

was wearing "a weird outfit," and because of "everything that's going on with ISIS." Had Al-Menhali remained seated in the hotel's lobby for another minute or two, he inevitably would have been detained inside the hotel.

Second, it is unclear whether Employee Defendants had fully completed assisting Al-Menhali before they requested police assistance. Acton-Bell testified that she went to further assist Al-Menhali after Silva insisted that she take over the transaction; however, by the time she got to the front desk she received a call from Avon PD. Conversely, Al-Menhali testified that he took a seat in the lobby because he was waiting on the Employee Defendants to provide him with the information he requested. He then testified that he grew tired of waiting for the Employee Defendants and decided to leave. According to Hotel Defendants' policy, employees are to help potential guests find other lodging, if the hotel cannot accommodate them.

Although some facts show that Employee Defendants completed their transaction with Al-Menhali in a nondiscriminatory way, Plaintiff Al-Menhali has provided several facts demonstrating that the hotel employees might not have. Drawing all reasonable inferences in favor of the Plaintiff, the court finds that a jury could conclude that Al-Menhali was denied the full enjoyment of the hotel services "*for reasons not applicable alike*" to other customers. *See Lysyj*, 313 N.E.2d at 6; *see also Meyers*, 721 N.E.2d at 1083.  Therefore, Employee Defendants' Motion for Summary Judgment on Count 6 is denied.

### C.  False Alarm Claim

Count 7, of Plaintiffs' Complaint, claims that Employee Defendants made a false alarm, in violation of Ohio Rev. Code Ann. § 2917.32, when they requested that the police be called. Section 2917.32, a criminal act, states:

18

(A) No person shall do any of the following:
(1) Initiate or circulate a report or warning of an alleged or impending fire, explosion, crime, or other catastrophe, knowing that the report or warning is false and likely to cause public inconvenience or alarm;
(2) Knowingly cause a false alarm of fire or other emergency to be transmitted to or within any organization, public or private, for dealing with emergencies involving a risk of physical harm to persons or property;
(3) Report to any law enforcement agency an alleged offense or other incident within its concern, knowing that such offense did not occur.

*Id.*

Plaintiff Al-Menhali brings his claim for false alarm pursuant to Ohio Revised Code § 2307.60 which permits an individual to pursue a civil cause of action for injuries sustained as a result of a criminal act. *See Jacobson v. Kaforey*, 75 N.E. 3d 203, 207 (Ohio 2016). However, the parties dispute whether a criminal conviction is a condition precedent in order to pursue a civil claim under O. R. C. § 2307.60.  In *Jacobson*, the Ohio Supreme Court held that " R. C. 2307.60 creates a civil cause of action for damages resulting from any criminal act." *Id.*  However, the court explicitly stated that it would not opine on what a plaintiff must do to prove a claim under the statute, because its ruling was limited to "answering the certified-conflict question."  *Id.* at 206.

While we acknowledge that the Ohio Supreme Court has not answered whether a criminal conviction is necessary to sustain a civil claim pursuant to O.R.C. § 2307.60, and that a court in this district has certified that question to the Ohio Supreme Court,[3] we are persuaded that there is sufficient and uncontradicted Ohio court precedent establishing that a criminal conviction is required before a civil liability arises.  *Tri-State Computer Exchange, Inc. v. Burt*, 2003-Ohio-3197, ¶ 23, 2003 WL 21414688, at *5 (Ohio Ct. App. 1 Dist. 2003) (affirming a trial court's dismissal of the plaintiff's O.R.C.§ 2307.60 claim on the grounds that the "complaint failed to allege that the defendants[] had

---

[3]      *See Buddenberg v. Weisdack*, No. 1:18-CV-00522, 2018 WL 3949557 (N.D. Ohio Aug. 17, 2018) (Polster, J.)

been convicted of any crime[]"); *See Hite v. Brown*, 654 N.E.2d 452, 455 (Ohio Ct. App. 8 Dist. 1995) (explaining that Ohio "require[s] a criminal violation before civil liability may arise[]"); *Ivancic v. Cleveland Elec. Illuminating Co.*, 1993 WL 367092, at *4 (Ohio Ct. App. 8 Dist. 1993); *see also e.g., Jane v. Patterson*, No. 1:16-CV-2195, 2017 WL 1345242 (N.D. Ohio Apr. 12, 2017); *A.A. v. Otsego Local Sch. Bd. of Educ.*, No. 3:15-CV-1747, 2016 WL 7387261 (N.D. Ohio Dec. 21, 2016); and *Ortiz v. Kazimer*, No. 1:11 CV 01521, 2015 WL 1400539 (N.D. Ohio Mar. 26, 2015) (finding that "[r]ecovery depends on the existence of a criminal conviction[]"). In the present case, Plaintiff Al-Menhali has not pled or proffered evidence demonstrating that Defendants were convicted of any criminal acts as a result of the incident at Fairfield Inn. Therefore, the court grants summary judgment in favor of Employee Defendants on Count 7 of the Complaint.

**D. Intentional Infliction of Emotional Distress**

Next, Plaintiffs assert a claim of intentional infliction of emotional distress ("IIED") against Employee Defendants (Count 8). Under Ohio law, to prove IIED, a plaintiff must show that: (1) "the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;" (2) "the actor's conduct was extreme and outrageous so as to go 'beyond all possible bounds of decency' and "was such that it can be considered as 'utterly intolerable in a civilized community';" (3) "the actor's actions were the proximate cause of plaintiff's psychic injury;" and (4) "that the mental anguish suffered by plaintiff is serious and of a nature that 'no reasonable man could be expected to endure it.'" *See Ashcroft v. Mt. Sinai Med. Ctr.*, 588 N.E. 2d 280, 284 (Ohio Ct. App. 1990) (internal citations omitted).

The court agrees with Defendants that Plaintiffs have not demonstrated that Silva's and Acton-Bell's conduct was extreme and outrageous so as to go beyond all possible bounds of decency. In

Ohio, "[o]nly the most extreme wrongs, which do gross violence to the norms of a civilized society, will rise to the level of outrageous conduct." *Brown v. Denny*, 72 Ohio App. 3d 417, 423 (1991). In *Yeager v. Local Union 20*, 453 N.E.2d 666, 671 (Ohio 1983), the Ohio Supreme Court explained:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

It is difficult for a plaintiff to satisfy the standard for IIED, under Ohio law. *See, e.g., Paolucci v. Robinson Memorial Hosp*., No. 94-P-0022, 1995 WL 236743 (Ohio Ct. App. Mar. 10, 1995) (conduct included supervisor allegedly striking the plaintiff). For example, in *Wolfe v. Thermo Fischer Scientific, Inc*., the plaintiff alleged that the defendants made sexually-charged remarks at a company-sponsored event, and then failed to investigate the plaintiff's complaints of sexual harassment and retaliation. 2:08-V-933, 2009 WL 1255023, at *2 (S.D. Ohio May 4, 2009). Instead, the defendants filed a false claim of sexual harassment against the plaintiff and "falsely imprisoned [the] [p]laintiff for four hours without food or water while they interrogated, intimidated, harassed and embarrassed her." *Id*. Finally, the plaintiff claimed that she was ultimately terminated because of her complaints about the hostile work environment to which she was subjected. *Id*. at *1. The court found that these facts, although "incorrigible," do not rise to the level of intentional infliction of emotional distress under Ohio law. *Id*. at *2; *see also Hill v. Vill. of W. Lafayette*, No. 95CA27, 1996 Ohio App. LEXIS 3721, at 12-13 (Ohio Ct. App. May 24, 1996) (finding employer's pattern of harassment,

21

which included false disciplinary charges and defamatory conduct against plaintiff, was insufficiently extreme or outrageous); *Boggs v. Avon Prods., Inc*., 56 Ohio App. 3d 67, 73, 564 N.E.2d 1128 (Ohio Ct. App. 1990) (allegations that plaintiff's supervisor continually harassed and threatened him after he suffered an accident, knowing that such conduct would cause him anxiety, did not rise to level of "atrocious," "utterly intolerable," or "outrageous").

In the present case, construing the evidence in the light most favorable to Plaintiffs, the Employee Defendants' conduct might have been insensitive and misguided, but their actions do not reach the very high bar of showing extreme and outrageous conduct. *See Yeager*, 453 N.E.2d at 671. Accordingly, the court grants Employee Defendants' Motion for Summary Judgment on this claim.

### E.  Negligent Infliction of Emotional Distress

Plaintiffs also assert a claim from negligent infliction of emotional distress ("NIED") against Employee Defendants (Count 9).  In *Schultz v. Barberton Glass Co.*, 447 N.E.2d 109 (Ohio 1983), the Ohio Supreme Court held that plaintiffs who are directly involved in an accident may state a cause of action for the negligent infliction of emotional distress, even without a contemporaneous physical injury. Three months after that decision, in *Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio1983), the court extended its holding to persons who observe an accident as bystanders but who are not directly involved in the accident.

For both *Shultz* and *Paugh* plaintiffs, compensable emotional and mental injuries are limited to serious emotional distress— i.e., injury which is both severe and debilitating to a reasonable person. *Id*. However, in *Binns v. Fredendall*, 513 N.E.2d 278, 281 (Ohio 1987), the Ohio Supreme Court clarified its holding in *Paugh.* Therein, the court explained that *Paugh* did not "limit recoveries by traditional tort victims seeking to recover for negligently inflicted emotional injuries accompanied by

22

contemporaneous physical injury." *Id*. Thus, under *Binn*, negligently inflicted emotional distress "sustained by a plaintiff who also suffers contemporaneous physical injury need not be severe and debilitating to be compensable." *Id*. at 280.

Finally, negligent emotional and mental injury sustained by a *Shultz*, *Paugh*, or *Binn* plaintiff must have been reasonably foreseeable. *See Paugh*, 451 N.E.2d at 766. For plaintiff-bystanders evaluated under *Paugh*, courts are instructed to consider multiple factors and the traditional foreseeability test for tort claims to determine whether a plaintiff's injuries were reasonably foreseeable. *Id*. However, because Ohio courts examine *Binn* plaintiffs under traditional tort rules, the multiple factors are inapplicable to a foreseeability analysis. Therefore, when determining a defendant's foreseeability in this context, the test is simply whether the defendants' "act is likely to result in injury to someone." *Strother v. Hutchinson*, 423 N.E.2d 467, 471 (Ohio 1981).

Employee Defendants maintain that Al-Menhali has failed to establish that his emotional distress is severe and debilitating, and that the Employee Defendants could not have foreseen that a "SWAT team would appear on the premises and forcibly 'take down' the Plaintiff." (ECF No. 41, PageID # 646–47.) However, because Al-Menhali was contemporaneously physically injured during the incident, he does not have to establish the heightened standard applicable to a plaintiff-bystander in *Paugh*. All that is required is some "guarantee of genuineness" to support his claim for emotional distress. *Powell v. Grant Med. Ctr*., 771 N.E.2d 874, 878 (Ohio App. 2002). While expert medical testimony is helpful, it is not required to demonstrate emotional distress. *Paugh,* 451 N.E.2d at 767. A witness that is "acquainted with the plaintiff[] may testify as to any marked changes in the emotional or habitual makeup that they discern in the plaintiff after the accident has occurred." *Id.* Furthermore, as explained above, all that Employee Defendants had to foresee, in this context, was

that their conduct could result in injury to Al-Menhali, not that it would lead to a SWAT team. *See Strother*, 423 N.E.2d at 471.

Here, Al-Menhali has established a genuine factual dispute as to the type and degree of emotional injury he purportedly continues to suffer as a result of the incident at Fairfield Inn. Shortly after he was detained by Avon PD, Al-Menhali lost consciousness and collapsed. He testified that he has trouble sleeping and suffers from nightmares. Further, insofar as he relies on his treating physician as merely a lay witness, he has provided evidence demonstrating that he continues to seek treatment for the traumatic encounter at the hotel.  Accordingly, a reasonable jury could conclude that he has suffered emotional distress as a result of the Employee Defendants' conduct and that it was reasonably foreseeable that their conduct would cause injury. Therefore, the court denies Employee Defendants' Motion for Summary Judgment on this claim.

### F.  False Light and Invasion of Privacy

Next, Defendants argue they are entitled to summary judgment on Plaintiff Al-Menhali's claim for False Light and Invasion of Privacy ("false light") (Count 10). To constitute false light, the communication must be: (1) false; (2) publicized; (3) highly offensive to a reasonable person, and (4) communicated with knowledge or reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. *Welling v. Weinfeld*, 866 N.E.2d 1051, 1059 (Ohio 2007). Further, to support a claim of false light, the information must be "communicated to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id*. at 1057.

The facts in this case are that Silva communicated her fears and concerns to her family members who then communicated her concerns to the Avon PD. There is no evidence that the

24

information she disseminated was done with the intent that it reach a wide-spread audience, or to anyone other than the police. There is no evidence that any of the statements communicated by Silva or Acton-Bell were meant to be communicated in a manner that made it substantially certain that they would become public knowledge. As the Ohio Supreme Court explained, the requirement that a statement be "publicized" is different from the requirement in defamation law—that the statement be "published." *See id.* Further, the mere fact that the statements are subsequently spread by third parties is not sufficient. Finally, in this case, matters transpired so quickly—Plaintiff Al-Menhali was released immediately after being seized—such that the media's reporting about the incident included information that he was wrongly seized.

For these reasons, the court finds that Plaintiffs have not put forth evidence to show that any false statements made by Defendants were publicized, regardless of the evidence demonstrating the other elements of the false light claim. Thus, Defendants' Motion is granted on this claim.

### G. Defamation and/or Libel

Next, Employee and Hotel Defendants argue that they are entitled to summary judgment on Plaintiffs' claim for Defamation and/or Libel (Count 11). Defendants contend that Silva's communications with her family members and Acton-Bell's and Silva's statements to Avon PD are qualifiedly privileged, immunizing them from civil liability. (ECF No. 61, PageID # 916.)

It is worth noting that Ohio courts recognize two types of privilege–*absolute* privilege and *qualified* privilege. Absolute privilege protects an individual's false or defamatory statement when made during "(1) legislative proceedings of sovereign states; (2) judicial proceedings in established courts of justice; (3) official acts of the chief executive officers of state or nation; and (4) acts done in the exercise of military or naval authority." *M.J. DiCorpo, Inc. v. Sweeney*, 634 N.E.2d 203, 209

(Ohio 1994) (quoting *Bigelow v. Brumley*, 37 N.E.2d 584, 588 (Ohio 1941)). Absolute privilege exists,  even if the statement was "made with actual malice, in bad faith and with knowledge of its falsity." *Id*.

On the other hand, Ohio courts have held that "communication[s] made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, [if such communication is] made to a person having a corresponding interest or duty," are afforded *qualified* privilege. *Hahn v. Kotten*, 331 N.E.2d 713, 718 (Ohio 1975). Many of the Ohio cases finding qualified privilege involve statements given to police officers concerning the possible commission of a crime. Therefore, qualified privilege protects individuals from liability for statements made outside of the above enumerated proceedings, and under narrow circumstances—e.g., statements given to police officers when reporting suspicions of criminal activity.

To obtain qualified privilege, "a defendant must establish that (1) he acted in good faith; (2) there was an interest to be upheld; (3) the statement was limited in its scope to the purpose of upholding that interest; (4) the occasion was proper; and (5) the publication was made in a proper manner and only to proper parties." *Mosley v. Evans*, 630 N.E.2d 75, 77 (Ohio Ct. App. 11 Dist. 1993). This privilege "exists even when the informant lacks reasonable grounds for his or her suspicions," and no duty is placed on the informant to "investigate whether there are reasonable grounds" for his or her belief. *Paramount Supply Co. v. Sherlin Corp*., 475 N.E.2d 197, 203 (Ohio Ct. App. 8 Dist. 1984). However, a defendant loses her qualified privilege defense, if the plaintiff can show, by *clear and convincing* evidence, that the statement was made with actual malice. *Id*.; *Mosley*, 630 N.E.2d at 77; *Hahn*, 331 N.E.2d at 721 (emphasis added). Under Ohio law, actual malice "is defined as 'acting with knowledge that the statements are false or acting with reckless disregard as to

their truth or falsity.'" *Mosley,* 630 N.E.2d at 78 (quoting *Jacobs v. Frank*, 573 N.E.2d 609, 614 (Ohio 1991)). Reckless disregard exists when there is a high degree of awareness of the statement's probable falsity. *Jacobs v. Frank*, 573 N.E.2d 609, 616 (Ohio 1991). When determining actual malice, Ohio courts "concentrate not only on the truth or falsity of the statement itself, but on the subjective belief of the author." *Id.*

Plaintiffs argue that Defendants did not act in good faith, because they "knowingly presented a lie to police." (ECF No. 50, PageID # 848.) However, the Employee Defendants testified that Al-Menhali's refusal to leave, his state of agitation, use of sunglasses indoors, and use of two cellphones were very suspicious. (*See* ECF No. 34-9, PageID # 221.) Acton-Bell testified that Silva was shaking and "appeared to be hyperventilating" when she came to ask Acton-Bell to finish assisting Al-Menhali, and that Silva's condition prompted her to instruct Silva to stay in the office. (ECF No. 36, PageID # 211.) Personal and public safety are legitimate interests to protect; and Silva's plea for help, limited to her family members, and Acton-Bell's statements to Avon PD, show that their statements were made in a "proper manner and only to proper parties." *Mosley*, 630 N.E.2d at 7. Plaintiffs have not provided the court with any evidence demonstrating that the Employee Defendants *knowingly* made false statements, did so with a high degree of awareness of their probable falsity, or that the Employee Defendants' behavior was feigned. *See Jacobs*, 573 N.E.2d at 616. Conclusory statements that Employee Defendants "knowingly lied to police" is not enough to show that the Defendants acted in bad faith.

Plaintiffs also argue that Employee Defendant Acton-Bell showed actual malice by perpetuating Silva's ISIS allegation when Avon PD's dispatch called the front desk to inquire about the situation. However, a review of the phone call recording demonstrates that Acton-Bell gave a

27

short, panicky, and ambiguous answer to the dispatcher's compound question in the middle of a tremendous amount of commotion. When viewed in its full scope, Acton-Bell's hesitant answer, "Umm. . . he is exiting. He just waved. And yes, he has two cell phones," does not rise to the level of "clear and convincing evidence" needed to show that she acted with actual malice. And, it would be in error to infer malice from Employee Defendants' failure to investigate their allegedly unreasonable suspicions, since Ohio places no duty on its citizens to investigate their suspicions of criminal activity. *See Mosley,* 630 N.E.2d at 78.

Accordingly, the court finds that no evidence has been presented whereby a reasonable jury could conclude that Employee Defendants acted in bad faith or were motivated by actual malice. Therefore, the court grants summary judgment in favor of Defendants on this claim.

### H. Negligent Hiring, Training and Supervision

Plaintiff Al-Menhali also asserts a claim for negligent hiring, training and supervision against Hotel Defendants (Counts 13, 14). Under Ohio law, "[t]he elements of a negligent supervision claim essentially are the same as those required to prove negligent hiring[,]" and negligent training. *Sheldon v. Kettering Health Network*, 40 N.E.3d 661, 678, (Ohio Ct. App. 2 Dist. 2015). Accordingly, the elements are: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *Aycox v. Columbus Bd. of Educ.*, 2005-Ohio-69, ¶ 31, 2005 WL 44441, at *6 (Ohio Ct. App. 10 Dist. Jan 11, 2005); *Evans v. Ohio State Univ.*, 680 N.E.2d 161, 171 (Ohio Ct. App. 10 Dist. 1996).

Plaintiffs have offered to dismiss their claim for negligent hiring of Silva or Acton-Bell. Since

they have put forth no evidence to support any elements of that claim, the court will grant summary judgment in favor of Defendants in regard to it. Also, Plaintiffs have not put forth any evidence that Silva or Acton-Bell were negligently trained. Indeed, Silva was still in training and under the active supervision of the hotel's manager, Acton-Bell. Plaintiffs stress the fact that, prior to the incident in suit, Acton-Bell had only watched a training video which made her aware that Marriott was an international company and other videos that only hinted at diversity by using actors of different races, sexes and nationalities. Plaintiff Al-Menhali emphasizes that the employees did not specifically have diversity or cultural training. However, Plaintiff does not provide the nature of the training that he maintains should have been provided, or how it would have prevented the alleged misconduct here. *See Hamlin v. Motel Six*, 2000 WL 731716, at *4 (Ohio Ct. App. 2 Dist. June 9, 2000) (explaining that absent some evidence that the training was designed to prevent or discourage the unwanted conduct by employees, the court could not say that the failure to provide the training resulted in the employee's alleged behavior). As a result, the court concludes that Plaintiffs have presented no evidence to support a finding that River's Edge was negligent in their training of Silva or Acton-Bell, or that their negligence caused Plaintiff's injuries. Therefore, the court grants summary judgment to Defendants on this claim.

The court concludes otherwise on the negligent supervision claim. Acton-Bell, as the manager, was acting on behalf of River's Edge in this matter. She knew that Silva was new to the job and was receiving on-the-job training under her supervision. She was aware, or should have been aware, that Silva was not competent to handle this situation as a new employee. Silva had to go to Acton-Bell's office, because she did not know the answer to Al-Menhali's question about extended stays. After learning that the hotel did not offer extended stays, and communicating that information to Plaintiff,

Silva had to return to Acton-Bell's office again to learn how to search for hotels in the area that might accommodate Plaintiff. Seeing that Silva was nervous, Acton-Bell returned to the counter with Silva to assist her. But she soon left Silva alone thereafter, returning to her office, while still being aware that Silva was nervous and uncomfortable. At some point during Silva's interaction with Plaintiff, Acton-Bell walked up to Silva and slipped her a note, that was repeatedly typed down the entire page, "get the gentleman out/away from the Fairfield Inn." When Silva again returned to Acton-Bell's Office to tell her she thought she heard the Plaintiff say Ali or Alla three times and that he was talking in a different language, Acton-Bell told her that she should stay in her office and shut the door, "[i]t's an oak door. And heavy, and it automatically locks." Before Acton-Bell returned to the counter, Silva informed her that she was going to text message her sister. It was Silva's group text message with her family members that led to the calls to Avon PD, who arrived at the hotel and subdued the Plaintiff.

On these facts, the court cannot conclude that Defendants are entitled to judgment as a matter of law. There is a genuine dispute over material facts from which a reasonable jury could conclude that River's Edge and/or Marriott, through the hotel manager (Acton-Bell), knew that Silva was not competent to handle the situation presented. Nevertheless, she continued to try to let her handle the situation. Even as she sought to assist Silva, Acton-Bell's supervisory oversight exacerbated the situation, including when she handed Silva the note indicating she should get Plaintiff out of there and by stressing that Silva should lock herself in the office, all with the knowledge that she was "freaking out" and about to communicate with her family. A jury could conclude that Plaintiff Al-Menhali was injured as a result of Silva's actions, which was caused by the negligent supervision of Hotel Defendants through its representative, the hotel manager, Acton-Bell.

**I. Negligence**

Plaintiffs also bring a general negligence claim against Employee and Hotel Defendants (Count 12).  Defendants maintain that they are entitled to summary judgment on this claim, because Plaintiff Al-Menhali failed to show the proximate cause for his physical and emotional injury, and proximate cause for his lost profits.

To establish negligence, "one must show in addition to the existence of a duty, a breach of that duty and injury resulting proximately therefrom." *Mussivand v. David*, 544 N.E.2d 265, 270 (Ohio 1989). To show proximate cause, the plaintiff's injury must have been reasonably foreseeable. *Mussivand*, 544 N.E.2d at 272. Under Ohio law, "[i]f an injury is the natural and probable consequence of a negligent act and it is such as should have been foreseen in the light of all the attending circumstances, the injury is then the proximate result of the negligence." *Id.* As explained above, "[i]t is not necessary that the defendant should have anticipated the particular injury. It is sufficient that his act is likely to result in an injury to someone." *Id.* When a plaintiff suffers emotional injury, a lay witness who is acquainted with the plaintiff, "may testify as to any marked changes in the emotional or habitual makeup that they discern in the plaintiff after the accident has occurred." *Paugh*, 451 N.E.2d at 767. However, to recover for lost profits, "[t]he damages that result from an alleged wrong must be shown with reasonable certainty, and cannot be based upon mere speculation or conjecture, regardless of whether the action is in contract or tort." *Wagenheim v. Alexander Grant & Co.*, 482 N.E.2d 955, 967 (Ohio Ct. App. 10 Dist. 1983)*; see also Digital & Analog Design Corp. v. N. Supply Co.*, 540 N.E.2d 1358, 1362 (Ohio 1989). Reasonable certainty may be established "with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *AGF, Inc. v. Great Lakes Heat Treating Co.*, 555 N.E.2d 634, 640 (Ohio 1990) (citations omitted).

31

For many of the same reasons identified in Plaintiffs' negligent supervision claim, the court finds that a reasonable jury could conclude that Defendants' negligence was the proximate cause of some of Plaintiff Al-Menhali's physical and emotional injury. Again, the hotel manager, Acton-Bell, knew that Silva was not competent to handle the situation presented; however, she continued to try to let her handle the situation. Even as she sought to assist Silva, her supervisory oversight exacerbated the situation, including when she handed Silva the note indicating Silva, a new hire, should get Plaintiff far away from the hotel and by stressing that Silva should lock herself in the office. As a result of Employee Defendants' conduct, Plaintiff Al-Menhali was forcibly detained, handcuffed, and placed in the backseat of a police car. Shortly after being released and uncuffed, Plaintiff lost consciousness and collapsed outside the hotel.

While certain injuries might require the need of expert medical testimony, it is clear that Ohio law allows some injuries to be proved by lay witness and injured party testimony. For these reasons, the court finds that Plaintiffs have provided evidence to establish a genuine factual dispute as to whether Employee Defendants' actions were the proximate cause of his injury. Thus, the court denies Defendants' Motion for Summary Judgment on this claim, insofar as it relates specifically to physical and emotional injury.

However, regarding Plaintiff Al-Menhali's claim for lost profits, the evidence he provides is highly speculative and does not come close to establishing that the lost profits can be shown with a reasonable certainty. Thus, the court grants Defendants' Motion for Summary Judgment on this claim, insofar as it relates specifically to Plaintiff Al-Menhali's claim for lost profits.

**J.  Vicarious liability and Respondeat Superior**

32

Next, Plaintiffs maintain that Defendant River's Edge[4] (franchisee) is an actual agent, or in the alternative, apparent agent, of Defendant Marriott (franchisor). Therefore, according to Plaintiffs, Defendant Marriott can be held liable for the acts committed by River's Edge's employees. (ECF No. 50, PageID # 839.)

An agency relationship is normally a contractual relation created by an express or implied agreement between the parties. *Irving Leasing Corp. v. M & H Tire Co.*, 475 N.E.2d 127, 132 (Ohio Ct. App. 1984). To determine whether an agency relationship exists between a franchisor and a franchisee, Ohio courts evaluate "the degree of control the franchisor has over the operations of the franchisee's business." *Puente v. Garcia*, 1986 WL 14372, at *2 (Ohio Ct. App. 6 Dist. Dec, 12 1986). A franchisor cannot be held vicariously liable for the actions of a franchisee "[i]f the franchisor has no power over the daily operations of the business." *Id*. Under Ohio law, the relationship is dependent upon the principal's right to control, not whether it exercised control. *Ross v. Burgan*, 126 N.E.2d 592, 596 (Ohio 1955).

Further, in the absence of an express or implied agreement between the parties, agency may be established "if the principal, intentionally or by lack of ordinary care, causes or allows third persons to act upon the apparent agency relationship." *Irving Leasing Corp.*, 475 N.E.2d at 132. Such a relationship can be established if it can be "shown that the principal held the agent out to the public as possessing sufficient authority to act on his behalf and that the person dealing with the agent knew

---

[4]    Fairfield Inn and Suites is a proprietary mark and trade name that belongs to Defendant Marriott. The entity that holds and manages the franchise under that name is Lodging Industry, Inc. on behalf of and as general partner of Defendant Inn on the River's Edge, LP. For simplicity, the court will refer to Defendants Lodging Industry, Inc. and Inn on the River's Edge, LP collectively as "River's Edge."

these facts and, acting in good faith, had reason to believe the agent possessed the necessary authority." *Id*.  A provision in a franchise agreement that the franchisee "shall not be an agent does not defeat an agency by apparent authority." *Agosto v. Leisure World Travel, Inc*., 304 N.E.2d 910, 913 (Ohio Ct. App. 10 Dist. 1973) Lastly, when a franchisor authorizes a franchisee to use its business or trade name, "the public is entitled to assume that transactions they undertake with one using that trade or business name. . . are transactions with the person whose business or trade name is being used. *Id; see Lachman v. Bank of Louisiana in New Orleans*, 510 F. Supp. 753, 759 (N.D. Ohio 1981) (quoting *Agosto*)*; see also  Heritage Oldsmobile Cadillac v. Fifth Third Bank*, No. C-890370, 1990 WL 151754, at *4 (Ohio  Ct.  App. 1 Dist. Oct. 10,  1990); *Nationwide Commc'ns, Inc. v. Buckeye Ventures, Inc*., No. 86AP-88, 1986 WL 10414, at *3 (Ohio Ct.  App. 10 Dist. Sept. 18, 1986);*Burns v. Cleveland Clinic Foundation*, 974 N.E.2d 1291, 1294 (Ohio Com. Pl. 2011). Finally, "the existence of an agency relationship is a question of fact, rather than one of law." *Brainard v. American Skandia Life Assur. Corp*., 432 F.3d 655, 661 (6th Cir. 2005) (citing *McSweeney v. Jackson*, 691 N.E.2d 303, 308 (Ohio Ct. App. 4 Dist. 1996)).

Marriott maintains that it "did not control the day-to-day operations of the hotel, including the hiring, supervision, or retention of the employees." (ECF No. 42, PageID # 669.)  While Marriott concedes that the Franchise Agreement between it and River's Edge " prescribes or incorporates certain standards and guidelines," it contends that it does not control the day-to-day operations and policies relevant to the oversight of employees and procedures. (*Id*.) Plaintiffs point to a number of provisions in the Franchise Agreement, demonstrating that Marriott indeed maintains some control over certain aspects of River's Edge's operations; however, none of the cited provisions shows that Marriott had control of the policies, procedures, and personnel relevant to this action. (*See*, *e.g*., ECF

34

No. 50, PageID # 834–85.) Specifically,  Plaintiffs offer no evidence to refute Marriott's contention that River's Edge, not Marriott, was solely responsible for the training, hiring, and supervision of Employee Defendants. Control for the purpose of maintaining the look and feel of Marriott, is far different from control for the purpose of training and supervising.  *See* A*ccord Aluminum Line Prods. Co. v. Rolls–Royce Motors*, 649 N.E.2d 887, 894 (Ohio Ct. App. 3 Dist. 1994) ("'[A]gency for the one purpose does not necessarily imply agency for the other.'") (quoting *Funk v. Hancock*, 586 N.E.2d 1113, 1117 (Ohio Ct. App. 1 Dist. 1990)).

However,  Plaintiffs have established a genuine factual dispute over whether Defendant Marriott held River's Edge out as an agent under an apparent authority theory. For example, Plaintiffs point to (1) the River's Edge's online presence that brands the Marriott name and trademark, (2) River's Edge's use of  the Marriot Rewards system; (3) and that River's Edge's trademark sign, emblazoned on the outside of the hotel, is "Fairfield Inn and Suites Marriott," Marriott's proprietary mark. (ECF No. 50, PageID # 841; Ex. A.) Courts have held that such evidence can preclude summary judgment. *See Agosto*, 304 N.E.2d at 913 (trade name and other evidence can be used to demonstrate reliance and support a finding of apparent agency); *see also Cooley v. Valero Energy Corp.,* No. 2:11–cv–526, 2012 U.S. Dist. LEXIS 40291, at *15–17 (S.D. Ohio Mar. 20, 2012) (required use of franchisor marks and other factors presented factual dispute over apparent agency and precluded summary judgment; *Coleman v. Chen,* 712 F. Supp. 117, 124 (S.D. Ohio 1988) (questions over franchisor's degree of control under licensing agreement coupled with plaintiff's lack of knowledge as to ownership of hotel presented factual dispute over apparent agency and precluded summary judgment); *Broock v. Nutri/Sys., Inc.,* 654 F. Supp. 7, 10–11 (S.D. Ohio 1986) (arguably misleading advertising, signage, and directory listing coupled with possible reasonable reliance by plaintiff on

35

these factors presented factual dispute over apparent agency and precluded franchisor obtaining summary judgment); *and see Lachman v. Bank of Louisiana in New Orleans*, 510 F. Supp. 753, 759 (N.D. Ohio 1981) (noting *Agosto*'s application of Ohio's agency law). The Sixth Circuit has instructed that courts should deny a motion for summary judgment, "if any conflicting evidence of an agency relationship between" the plaintiff and the defendant is presented. *Brainard*, 432 F.3d at 661 (applying Ohio agency law). Here, the court finds that a reasonable jury could conclude that an agency relationship exists between Defendant River's Edge and Defendant Marriott.

Finally, Plaintiffs maintain that Defendants River's Edge and Marriott are responsible for the tortious acts of Employee Defendants under the doctrine of *respondeat superior*. (ECF No. 50, PageID # 841.) Hotel Defendants argue that they cannot be held liable for Employee Defendants' acts because their actions were outside the scope of their employment. (ECF No. 61, PageID # 920.)

The Ohio Supreme Court has consistently held that, "in order for an employer to be liable under the doctrine of *respondeat superior*, the tort of the employee must be committed within the scope of employment. Moreover, where the tort is intentional, the behavior giving rise to the tort must be 'calculated to facilitate or promote the business for which the servant was employed.'" *Osborne v. Lyles*, 587 N.E.2d 825, 828–29 (Ohio 1992) (quoting *Byrd v. Faber*, 565 N.E.2d 584, 587 (Ohio 1991)). However, "an intentional and wilful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from his employment and his principal or employer is not responsible therefor." *Byrd,* 565 N.E.2d at 588 (quoting *Vrabel v. Acri*, 103 N.E.2d 564, 568 (Ohio 1952)).

Defendant River's Edge argues that if Employee Defendants' conduct was "motivated by nothing more than malicious racism, such conduct would be for purely personal purposes and not the

advancement of the hotel's interest." (ECF No. 61, PageID # 922.) As River's Edge highlights, Plaintiff Al-Menhali has consistently maintained that Employee Defendants' actions were motivated by racism and Islamaphobia, and that they intentionally fabricated stories and told "bold-face" lies to police. However, Ohio law clearly contemplates scenarios where an employee acts both maliciously and in the furtherance of her employer's business interests. *See Osborne*, 587 N.E.2d at 828–29. Plaintiffs have offered some evidence demonstrating that Employee Defendants' alleged intentional and willful attack on Al-Menhali was to further the Hotel Defendants' interests. (*See*, *e.g.*, ECF No. 50, PageID # 841–42.) Whether Plaintiffs proffered evidence that demonstrates that Employee Defendants acted to further Hotel Defendants' business interests is a question of fact for the jury.

In viewing the facts in a light most favorable to Plaintiffs, a reasonable jury could conclude that Employee Defendants' conduct was done within the scope of employment.  Accordingly, Hotel Defendants' requests for summary judgment is denied on this claim.

### K.  Loss of Consortium

Finally, Plaintiff Al-Menhali's wife asserts a claim for loss of consortium. Under Ohio law, it is well-established that a "claim for loss of consortium is derivative in that the claim is dependent upon the defendant[ ] having committed a legally cognizable tort upon the spouse who suffers *bodily injury.*" *Campbell v. PMI Food Equipment Group, Inc.,* 509 F.3d 776, 790–91 (6th Cir. 2007) (explaining that, under Ohio law, loss of consortium claims "must be predicated on a tort involving bodily injury[]") (emphasis in original). And, "Ohio courts have repeatedly held that the term 'bodily injury' does not include nonphysical harms" *Id*. (quoting *Blatnik v. Avery Dennison Corp.*, 774 N.E.2d 282, 296 (Ohio Ct. App.  11 Dist. 2002)).

 Plaintiff Al-Menhali has established a factual dispute regarding his physical injuries as a result of the incident at Fairfield Inn. Accordingly, the court denies summary judgment on this claim.

### V.  CONCLUSION

For the reasons stated above: (1) Employee and Hotel Defendants' Motions to Strike Exhibits (ECF Nos. 53, 58) are **denied**; (2) Employee Defendants' Motion for Summary Judgment (ECF No. 41) is **denied** as to Count 6 (Discrimination), Count 9 (Negligent Infliction of Emotional Distress), and Count 16 (Loss Consortium)—and **denied**, in part, as to Count 12 (Negligence); (3) Hotel Defendants' Motions for Summary Judgment (ECF Nos. 42, 43) are **denied** as to Count 15 (*Respondeat Superior*) and Count 16 (Loss of Consortium)—and denied, in part, as to Count 12 (Negligence) and Count 14 (Negligent Supervision).

The court grants summary judgment in favor of Defendants on Count 7 (False Alarm), Count 8 (Intentional Infliction of Emotional Distress), Count 10 (False Light), Count 11 (Defamation/Libel), and Count 13 (Negligent Hiring) and Count 14 (Negligent Training).  The court also grants Plaintiffs' Motion to File Consolidated Opposition to Defendants' Motion to Strike Exhibits *Instanter* (ECF No. 63).

IT IS SO ORDERED.


/S/ SOLOMON OLIVER, JR.
UNITED STATES DISTRICT JUDGE

March 29, 2019

38