IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AHMED AL-MENHALI, et al<br><br>Plaintiffs,<br><br>v.<br><br>MARRIOT INTERNATIONAL, et al.,<br><br>Defendants. | CASE NO.   1:17-CV-01089-SO<br><br>JUDGE SOLOMON OLIVER, JR. |

**PLAINTIFF'S TRIAL BRIEF**

Plaintiffs, through counsel, respectfully submits their Trial Brief to the Court, pursuant to the Court's April 11, 2019 Civil Trial Order (ECF 68).

### I.  SYNOPSIS OF FACTS

Plaintiff Al-Menhali is a resident of the United Arab Emirates. In the spring of 2016, he was in the Cleveland area to receive medical treatment from the Cleveland Clinic. On June 29, 2016, he traveled to the Fairfield Inn and Suites in Avon, Ohio, hoping to book an extended stay room. He believed he was in a Mariott hotel. Al-Menhali's first language is Arabic, though he understands and speaks some English, with a heavy accent. He is Muslim. And on June 29, 2016, he was wearing Emirati Muslim traditional dress consisting of a kandura (robe), head scarf, and head covering. He was also wearing prescription sunglasses.  While in the US, Al-Menhali carried more than one cellular phone because he used one to communicate locally and the other to communicate internationally.

Defendant Alexis Silva, the front desk clerk, interacted with Al-Menhali first. She had recently been hired by Fairfield and was being trained and supervised by Defendant Acton-Bell.

1

At the time she interacted with Al-Menhali, Silva's training had consisted only of shadowing Acton-Bell. She had not been required to watch or attend any other training sessions and had not received any diversity or cultural-sensitivity training.

At the desk, Al-Menhali told Silva that he was a Cleveland Clinic patient and he had some difficulty communicating as a result of a stroke. He then asked for information about long-term stay accommodations. Silva asked Acton-Bell for help because she did not know the answer. Acton-Bell and Silva both attended to Al-Menhali at the desk at different points during his time in the lobby.

Acton-Bell admits that Silva was uncomfortable because of the way Al-Menhali was dressed. Silva claims she was concerned because of all the news regarding terrorism, and because Al-Menhali wore sunglasses and did not give his name when he first walked into the hotel as most registered guests do. Acton-Bell claims she did not discriminate against Al-Menhali. Nonetheless, she reported to police, after the incident, that he was asking about "remote locations" (an organic farm in Geauga) and for hotels between Avon and Cleveland, as if that somehow was suspicious activity. She was uncomfortable and suspicious because he was lingering for a long time, asking questions about locations, "he didn't seem to want to use [the information they were giving him] to his benefit," and he kept sitting on the sofa. She acknowledges that there was some language barrier. Acton-Bell was trying to get Al-Menhali out of the hotel from the beginning of the interaction. Al-Menhali was in the hotel approximately 15-20 minutes.

Al-Menhali testified that he did make at least one call to another accommodation but was unable to find a long-term rental. He then waited in the lobby for the younger desk clerk (Silva) who had told him to wait. At some point he tired of waiting, said goodbye to Acton-Bell who was at the desk, and began to walk out of the lobby.

Throughout Al-Menhali's time in the hotel, Acton-Bell continuously escalated the intensity of the situation and contributed to the Silva's nervousness. During the course of the interaction, Acton-Bell, Silva's supervisor, passed Silva a note which she printed from her office to the printer at the front desk and then handed to Silva. The note read something along the lines of "get him as far away from Avon as possible and FFI [Fairfield Inn]." The message was copied and pasted repeatedly, filling the entire sheet of paper. This note caused Silva to "freak out." Acton-Bell advised Silva that they should call the police.

Defendants also made false allegations that Al-Menhali was connected to ISIS. Defendants dispute who first brought up the ISIS connection, but it is undisputed that the false allegation was made. Although she denied making these false accusations in her first interview with the police, Silva later admitted that she accused Al-Menhali of pledging allegiance to ISIS. Silva claims that Acton-Bell brought up ISIS after Silva told her that she heard Al-Menhali say "alli" or "Allah" while speaking in Arabic on his phone. Acton-Bell, on the other hand, claims that she did not even know what ISIS meant.

Acton-Bell also told Silva that "something is up" with Al-Menhali, that she would go deal with it, and instructed Silva to go into her office, which has a self-locking door and is a "safe-haven." These comments and instructions escalated Silva's unreasonable fear.

Unbeknownst to Al-Menhali, Silva was communicating with her family throughout his time at the hotel. She sent her family members a series of text message falsely accusing Al-Menhali of pledging allegiance to ISIS and asking them to call the police. There is no dispute that this allegation was completely fabricated. Though Al-Menhali never made any threat to Silva or to Acton-Bell, Silva's family did call the police and relayed this false accusation.

Police later discovered the following text messages on Silva's cellular phone, sent to her

3

family members including her sister (Ally), her father (Lonnie), and her mother (Nicole):

> Asilva: I love you guys
> Nicole: You do
> Asilva: **There's a guy at my work who is pledging to Isis. He's in the full oufit.**
> Asilva: My manager is freaking out.
> Nicole: Call 911 now!
> Nicole: Call 911!
> Ally: Call it or I am
> Nicole: Now
> Nicole: Do you want me to?!
> Nicole: Hello Lexi what's going on??
> Ally: I'm calling
> Asilva: Mom call and tell them a suspicious guy here at the desk with deaposible phones two of them and dressed in the full out fit
> Asilva: Please someone
> Lonnie: Call now
> Asilva: Just say it's suspicious
> Ally: I am RIGT now
> Asilva: Help me
> Asilva: Please
> Asilva: Someone please it's Avon
> Asilva: It's Fairfield inn in Avon on Colorado
> Asilva: My phones dying
> Asilva: Im in the back
> Asilva: He won't leave
> Asilva: Please help
> Asilva: He's sitting in the lobby
> Lonnie: They are on there way
> Asilva: Did you say suspicious man in full gear with two phones
> Ally: Yes
> Lonnie: Yes
> Asilva: Looking for somewhere to stay for a month
> Asilva: They can't have sirens on
> Lonnie: They said they just spoke with Allison
> Asilva: I can't have them coming here with sirens
> Nicole: Did you tell them that ally???
> Ally: No she didn't say no sirens
> Asilva: Shooting
> Ally: What
> Ally: Shooting?
> Asilva: Help
> Asilva: Shooting
> Asilva: Help
> Lonnie: No
> Ally: Lex

4

    Ally: Dad go up to her work
    Lonnie: Serious
    Nicole: I'm on my way!
    Nicole: I left work
    Lonnie: Lexi call me
    Nicole: Lonnie I have tried and Alli has tried she's not answering
    Asilva: I'm ok stop
    Lonnie: Are they shooting
    Ally: What's going on
      END OF CONVERSATION.

(typos in original) (emphasis added.)

    Silva's sister and father both called 911. As a result, Avon Police dispatched police officers with SWAT gear to the Fairfield Inn. They immediately identified Al-Menhali because he was the only man dressed in traditional Emirati Muslim attire, approached him at gunpoint and took him to the ground in a violent and painful seizure.

    After the police determined the allegations against Al-Menhali were false, they removed him from the cruiser and uncuffed him. Shortly thereafter, without warning, Al-Menhali collapsed onto the concrete. Al-Menhali was transported by ambulance to the hospital. He experienced confusion, dizziness, weakness on his left side, aphasia, and chest pain. He felt a great deal of pain. He also sustained a wound to his right arm when the Defendant Police officers took him to the ground. He had redness on his wrists for two weeks from the handcuffs.

    Al-Menhali continues to experience the impact of this traumatic experience. Although thankfully the Defendant Officers did not fire their weapons, Al-Menhali was aware as these events were unfolding that he could have easily been killed during the seizure or detention. This fear and trauma continue to haunt him: he suffers from nightmares, wakes up shaking, and dwells on this incident on a daily basis. Al-Menhali has been diagnosed with Major Depressive Disorder with Psychotic features and Post Traumatic Stress Disorder. Milki, Al-Menhali's wife' also suffered and continues to suffer from severe emotional distress and loss of consortium as a result of this

5

incident.

Silva's and Acton-Bell's false statements about Al-Menhali and the attack he suffered at the hands of the Avon Police played out on the national and international stages and in the media.[1]

## II. LEGAL AUTHORITY

Plaintiffs are proceeding to trial on the following claims:

- Discrimination in violation of ORC § 4112 against Defendants Silva, Acton-Bell, Marriott, and Inn on the River's Edge;

- Negligence against Defendants Marriott, Inn on the River's Edge, Silva, and Acton-Bell;

- Negligent Supervision against Defendants Marriot, Inn on the River's Edge, and Acton-Bell;

- Negligent Infliction of Emotional Distress against Defendants Silva, Acton-Bell, Marriott, and Inn on the River's Edge;

- Loss of consortium against Marriott, Inn on the River's Edge, Silva, and Acton-Bell;

- *Respondeat Superior* against Marriott and Inn on the River's Edge;

---

[1] Media reports on this incident were widespread. A small sampling includes, e.g., Al Jazeera, "Man confronted by US police after false ISIL accusation," July 2, 2016, available at https://www.aljazeera.com/news/2016/07/man-confronted-police-false-isil-accusation-160702164032829.html; Al Jazeera, "UAE protests US arrest of Emirati national in Ohio," July 3, 2016, available at https://www.aljazeera.com/news/2016/07/uae-emirati-national-arrested-ohio-160703175655166.html; BBC, "UAE warns against wearing national dress abroad," July 3, 2016, available at https://www.bbc.com/news/world-middle-east-36698839; The National, "'They were brutal with me' Emirati describes arrest in US after being mistaken for ISIL member," July 3, 2016, available at https://www.thenational.ae/uae/they-were-brutal-with-me-emirati-describes-arrest-in-us-after-being-mistaken-for-isil-member-1.167379; ABC News, "Mistaken Identity Leads to International Outrage," July 4, 2016, available at https://www.youtube.com/watch?v=pq_yvvOpiZ_Q; News 5 Cleveland, "New details in Avon ISIS mix up," August 31, 2016, available at https://www.youtube.com/watch?v=CrpcC6JCW9o; News 5 Cleveland, "Tourist Mistaken for Member of ISIS," July 1, 2016, available at https://www.youtube.com/watch?v=u2768WqQ78w; Cleveland.com, "Emirati Muslim never mentioned ISIS prior to arrest by Avon police," July 5, 2016, available at https://www.youtube.com/watch?time_continue=6&v=5fHtVZWUx_A; News 5 Cleveland, "Woman behind false ISIS claim no longer works at hotel," July 5, 2016, available at https://www.youtube.com/watch?v=Kj5g9TypM2E.

6

A. **Discrimination**

Ohio Rev. Code §4112.02(G) protects against unlawful discrimination in public places by prohibiting any "proprietor or any employee, keeper, or manager of a place of public accommodation" from denying "to any person, except for reasons applicable alike to all persons regardless of **race, color, religion,** sex, military status, **national origin,** disability, age, or ancestry, the full enjoyment of the accommodations, advantages, facilities, or privileges of the place of public accommodation." (Emphasis added.) The legislative intent of this statute was that all "illegal discrimination in places of public accommodation be totally and finally eradicated." *Ohio Civil Rights Comm. v. Lysyj, supra,* 38 Ohio St. 2d 217, 119 (Ohio 1974) (superseded by statute on other issue). This statute should be construed liberally in order to further this legislative intent. *Id.* at 220; *Fall v. L.A. Fitness*, *et. al.*, 161 F. Supp. 3d 601, 609 (2016).

Hotels are places of public accommodation and must comply with the standards set forth in O.R.C. § 4112.02(G). Full enjoyment of an accommodation includes that "right to purchase all services or products…, the right to be admitted…, and the right to have access to the services and products of such a place in the same manner as all other customers." *Meyers v. Hot Bagels Factory, Inc.*, 131 Ohio App. 3d 82, 104 (1999). It follows that "full enjoyment" of hotel accommodations include a person's right to enter, obtain services, and leave the hotel premises without incident, and to do so without Islamophobic and racist discrimination, false police reports, and false arrest.

Al-Menhali's purpose inside the Fairfield Inn was not unreasonable – he entered to seek accommodation and when he learned that the hotel did not offer the service that he needed, he requested assistance in locating a nearby hotel that would fit his needs. He spent only 15-20 minutes in the hotel lobby during which time he did not disturb any other guest, act unruly, or threaten or disrespect anyone. He then attempted to leave the hotel lobby. He was prevented from

7

doing so safely by the Avon Police, who had been summoned there as a result of Acton-Bell's and Silva's discriminatory and false allegations. The obvious principle motivation for these false allegations was discriminatory, based on Al-Menhali's traditional dress, indicating his status as an Arab and a Muslim, his Arabic language, and the words "alli" or "allah." There were other non-Arab, non-Muslim people present in the lobby at the same time; however, Silva and Acton-Bell did not make racist, anti-religious, or outrageous false statements about any of them.

Defendants' case law on this issue is entirely distinguishable from the injuries inflicted upon Al-Menhali. In *Meyers v. Hot Bagels Factory*, the plaintiff, a female restaurant customer, was not denied full accommodation by the restaurant. 131 Ohio App. 3d 82. She was served, seated, and allowed to leave the premises. While she was at the restaurant, the owner made very aggressive and traumatizing gender-based and sexual comments to her. The court found that in spite of these comments (which a jury found to be intentional infliction of emotional distress), the plaintiff was not denied any services. She also failed to establish gender-based discrimination because there was evidence that the defendant was indiscriminately hostile and rude. Similarly, the plaintiff in *Fall v. L.A. Fitness*, was not denied any accommodation offered by L.A. Fitness; rather he was simply not permitted to pray in one area of the gym, but was offered, and begrudgingly accepted, alternative locations to pray at the gym. 161 F. Supp. 3d at 609-610. He also was unable to demonstrate disparate treatment. Id. Neither of the plaintiffs in Fall or Meyer were denied the full enjoyment of the accommodation. Al-Menhali, in comparison, was prevented from full enjoyment of accessing front desk services without also becoming targeted by false, racist, and Islamophobic reports that foreseeably set into motion an unwarranted police response when no other person present in the lobby experienced such discrimination. He was also deprived of the full enjoyment of voluntary, peaceful, and safe egress from the premises without being

8

subjected to continuing racial and religious discrimination: Defendants never called off their false reports, and Silva remained hiding while Acton-Bell was on the phone with police dispatch as he walked out the door. Finally, Al-Menhali suffered demonstrable physical, mental, and other long-term harm.

### B. Negligence

To recover on a negligence claim, a plaintiff must prove that: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; and (3) the breach of the duty proximately caused the plaintiff's injury. *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, ¶ 22, 773 N.E.2d 1018. "Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff." *Commerce & Industry Ins. Co.*, 45 Ohio St.3d at 98, 543 N.E.2d 1188; *see also Huston v. Konieczny* (1990), 52 Ohio St.3d 214, 217, 556 N.E.2d 505.

There are multiple sources defining the parameters of Defendants' duty to Al-Menhali. The Ohio Supreme Court "has often stated that the existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." *Wallace v. Ohio DOC*, 2002-Ohio-4210, ¶ 23, 96 Ohio St. 3d 266, 274, 773 N.E.2d 1018, 1026.

Defendants owed Al-Menhali a duty of care as a guest, however temporary, in their hotel. The Defendants do not contest that they, and their employees, owed Al-Menhali a duty to be truthful, to exercise reasonable and ordinary caution and care, not to discriminate, and to conduct themselves in line with their Business Conduct Guide while he was a guest in their hotel. They breached their duties. It was foreseeable that an allegation of terrorist activity would summon a

9

strong and aggressive police response. The false allegation did proximately cause Plaintiffs' damages.

### C. Negligent Infliction of Emotional Distress

A negligent infliction of emotional distress claim requires that the emotional injuries suffered by a plaintiff must be both serious and reasonably foreseeable. *Paugh v. Hanks*, 6 Ohio St. 3d 72, 77-78 (1983). Although evidence of a serious physical injury is not required, it is admissible as evidence of the degree of emotional distress plaintiff suffered. *Id.* The Ohio Supreme Court identified a non-exhaustive list of examples of serious emotional distress – including traumatically induces neurosis and chronic depression. *Id.*

Defendants Silva and Acton-Bell caused Al-Menhali's severe physical and emotional injuries when they created and intentionally caused it to be reported a wholly fabricated connection between Al-Menhali and an Islamic extremist terrorist group to the police. Defendants cannot argue that they did not know or should not have known that such conduct would result in serious emotional distress to Al-Menhali, as any reasonable person understands the severity of an allegation of terrorism. "Terrorists" are arguably the most hated and feared group of people in American society. Defendants' conduct in falsely accusing Al-Menhali of terrorism was extreme and outrageous, and goes so far beyond all possible bounds of decency that it caused a SWAT-style police response from police. The harm caused to Al-Menhali was wholly foreseeable as a result of such an inflammatory and false accusation. Defendants' discomfort, based on their own discriminatory viewpoints, interacting with an Arab-Muslim man wearing traditional clothing, does not create legal justification for their conduct. Defendants attempt to disguise their recklessness by claiming that Al-Menhali's behavior fit within the categories of "suspicious behavior" the public was warned to watch for around the time of the Republican National

Convention. However, the defendants have not presented any evidence that the police advised them that any suspicious behavior from a Middle-Eastern man – let alone, that a man engaging in innocuous activities like asking for advice on a suitable hotel or talking on the phone – justified false accusations that he was pledging allegiance to ISIS.

Here, Al-Menhali did suffer severe emotional distress: he suffered immense fear and distress at the time of the incident, and he testified that even today he has trouble sleeping, suffers when nightmares when he can sleep, and wakes shaking. Al-Menhali's emotional distress claims are sufficiently supported[2]: Dr. Lachhwani, a psychiatrist with the Cleveland Clinic Abu Dhabi, has diagnosed Al-Menhali with Major Depressive Disorder with Psychotic features and Post Traumatic Stress Disorder. Lachhwani's diagnoses and treatment supports Al-Menhali's testimony that he continues to suffer the emotional impact from the traumatic encounter at Fairfield Inn. Evidence of his emotional distress is thus supported by more than his own testimony. Furthermore, Al-Menhali also suffered an actual, contemporary physical injury when he lost consciousness and collapsed (leading to a 4-day hospitalization) during his interaction with Avon Police.

**D. Negligent Supervision**

Plaintiff Al Menhali claims he was harmed by Defendants Silva and Acton-Bell and that the Marriot and Rivers Edge are responsible for that harm because Marriot and/or Inn on Rivers edge negligently supervised Silva and/or Acton-Bell. To establish this claim, Plaintiff must prove the following:

1. That Marriot and/or Rivers Edge hired Silva and/or Acton-Bell;

2. That Silva and/or Action Bell was unfit or incompetent to perform the work for which she was expected to perform;

---

[2] Although a plaintiff must present some "guarantee of genuineness" to support his claim of severe emotional distress, no expert testimony is necessary. *Uebelacker v. Cincom Sys., Inc.* (1988), 48 Ohio App.3d 268, 276; see, also, Dobbs, 2 Law of Torts (2001), 832, Section 306.

3. That Marriot and/or Rivers Edge knew or should have known that Silva and/or Acton-Bell was/were unfit and/or incompetent and that this unfitness and/or incompetence harmed Plaintiff; and

4. That Marriot and/or Rivers Edge's negligence in supervising Silva and/or Acton-Bell Rivers Edge was a substantial factor in causing Plaintiff's harm.

Aycox v. Columbus Bd. Of Educ., 2005-Ohio-69, ¶ 31, 2005 WL 44441, at *6 (Ohio Ct. App. 10 Dist. Jan 11, 2005); Evans v. Ohio State Univ., 680 N.E. 2d 161, 171 (Ohio Ct. App. 10 Dist. 1996). Acton-Bell, Silva's direct supervisor during the incident with Plaintiff, failed to appropriately supervisor, and rather affirmed and furthered Silva's discriminatory actions.

### *E. Respondeat Superior*

Marriott maintained actual agency relationship with its franchise. River's Edge/Lodging Industries is the franchisee of Marriot International, Inc. A franchisor may be liable for the acts of its franchisee when an agency relationship exists. *Taylor v. Checkrite,* 627 F.Supp. 415, 416 (S.D.Ohio 1986). Under Ohio law, whether a principal (the franchisor) has a right of control over the agent (franchisee) is central to the determination of an agency relationship. *See Griffith v. Rutledge,* 110 Ohio App. 301, 304, 169 N.E.2d 464(1960); *Taylor,* 627 F.Supp. at 416–17 (S.D.Ohio 1986); *Priess v. Fisherfolk,* 535 F.Supp. 1271, 1279 (S.D.Ohio 1982). The agency relationship is dependent upon the right of control, not the exercise of control at the moment of wrongdoing. *Griffith*. 110 Ohio App. At 304. Marriott maintains the right to control the major aspects of the Fairfield Inn; Marriott has an actual agency relationship with Inn on the Rivers' Edge for the operation of the Fairfield Inn and Suites, Avon.

Marriott also maintained an apparent agency relationship with Fairfield Inn and Suites. In order to establish apparent agency, it must be shown that the principal held the agent out to the public as possessing sufficient authority to act on his behalf, and that the person dealing with the agent knew this, and, acting in good faith, had reason to believe the agent possessed the necessary authority. *Irving Leasing Corp.*, 16 Ohio App.3d at 195, 475 N.E.2d at 132; see also *Logsdon v. ABCO Construction Co.*, 103 Ohio App. 233, 241–43, 141 N.E.2d 216 (1956). This theory is especially applicable when by license a business allows another to use its business or trade name. *Agosto v. Leisure World Travel, Inc*., 36 Ohio App. 2d 213, 216-217 (1973). The value and purpose behind the use of a trade name in promotion and advertising is the public's reliance on the trade name. *Id.* "When a business or trade name is so used, the public is entitled to assume that transactions they undertake with one using that trade or business name, with authorization to do so, are transactions with the person whose business or trade name is being used." *Id.*

Plaintiff believed in good faith that he was dealing with a Marriott entity because Fairfield Inn holds itself out as such and is permitted to do by so by Marriott. The outside of the building is emblazoned with the name of the hotel, "Fairfield Inn and Suites Marriott." Its website and online presence are all branded with the Marriott name, and the hotel utilizes the Marriott Rewards system.

Marriott and River's Edge are liable for the wrongful acts of their employees, including Silva and Acton-Bell, under the doctrine of *respondeat superior*. It is well established that an employer is responsible for the torts of its employees committed while acting in the scope of their employment. See Restatement of the Law 2d, Agency (1958) 481. Section 219(1); *Osborne v. Lyles*, 63 Ohio St. 3d 326 (1992); *Byrd v. Faber*, 57 Ohio St. 3d 56 (1991).

13

Whether an employee was acting within the course and scope of her employment at the time of the tort is a question of fact to be determined by the jury. *Osborne*, 63 Ohio St. 3d at 330. An employee's willful or malicious act does not remove the act from the scope of employment as a matter of law "unless the act is so divergent that its very character severs the employment relationship." *Id.*; *Stranahan Bros. Catering Co. v. Coit* (1896), 55 Ohio St. 398, 410 (1986); *Wiebold Studio, Inc. v. Old World Restorations, Inc.* 19 Ohio App.3d 246 (1985).

Silva and Acton-Bell were clearly working within the course and scope of their employment. They were working the front desk of the Fairfield Inn and interacted with Al-Menhali during his visit to their hotel as prospective guest; Silva lied to police, via her family, about Al-Menhali's actions in the hotel lobby; and Acton-Bell perpetuated Silva's falsehoods to police dispatch. Silva and Acton- Bell's conduct was tied to serving a hotel guest (Al-Menhali), and to the safety and wellbeing of Al-Menhali and all other guests.

### F. Silva's Refusal to Testify

Defendant Silva refused to testify at her deposition in this case and Plaintiffs anticipate she will refuse to testify at trial. Rather, she plead the Fifth Amendment to all questioning and indicated that she would plead the Fifth to every single question related to the incident with Al-Menhali. The Supreme Court has held that a negative inference can be drawn from a failure to testify in civil proceedings, and that drawing such an inference violates neither the Fifth Amendment nor Due Process. *Baxter v. Palmigiano,* 425 U.S. 308, 318-19, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Other statements by Silva are available and cited throughout Plaintiff's briefs and are included as trial exhibits. A witness who properly invokes his or her Firth Amendment privilege and refuses to testify is considered "unavailable" under FRE 804(a). *United States v.*

*Salerno*, 505 U.S. 317, 321 (1992). Additionally, Silva's other statements are admissible pursuant to FRE 801(d)(2)(A).

### III. EVIDENTIARY ISSUES

The Trial Order requires a discussion of any evidentiary issues likely to arise at trial. Plaintiff's counsel do not anticipate evidentiary issues at trial that have not already been raised in the various motions in *limine* and pretrial motions already filed by counsel for Plaintiffs and for Defendants.

Respectfully Submitted,
FRIEDMAN & GILBERT

/s/ Sarah Gelsomino
SARAH GELSOMINO (0084340)
JACQUELINE GREENE (0092733)
TERRY H. GILBERT (0021948)
55 Public Square, Suite 1055
Cleveland, OH 44113-1901
T: (216) 241-1430
F: (216) 621-0427
sgelsomino@f-glaw.com
jgreene@f-glaw.com
tgilbert@f-glaw.com

/s/ Marcus S. Sidoti
MARCUS S. SIDOTI (0077476)
50 Public Square, Suite 1900
Cleveland, OH 44113
Telephone:   (216) 357-3350
Facsimile:   (216) 357-3305
E-Mail:   marcus@jordansidoti.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

A copy of the foregoing was filed electronically on September 3, 2019. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. The notification of electronic filing via the Clerk's electronic filing system shall constitute service under Civ. R. 5.

>*/s/ Sarah Gelsomino*
>SARAH GELSOMINO
>
>One of the Attorneys for Plaintiff